**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
------------------------------------------------------X
ROBERT TUFANO,

                     Plaintiff,                    **FINDINGS OF FACT AND**
                                                   **CONCLUSIONS OF LAW**
          -against-                          CV 03-0977 (JO)

RIEGEL TRANSPORTATION, INC.,
                             Defendant.
------------------------------------------------------X

**JAMES ORENSTEIN, Magistrate Judge:**

Plaintiff Robert Tufano ("Tufano") commenced this action against defendant Riegel

Transportation, Inc. ("RTI") pursuant to the Consolidated Omnibus Reconciliation Act of 1985

("COBRA"), 29 U.S.C. § 1161 *et seq.* Tufano seeks compensation for damages sustained as a

result of defendant's failure to provide him with notification required under COBRA upon his

separation from employment with RTI. On March 9, 2005, the parties consented to my

jurisdiction over the case including entry of judgment pursuant to 42 U.S.C. § 636 and the

Honorable Leonard D. Wexler, United States District Judge, thereafter referred the matter to me.

Docket Entry ("DE") 23. A bench trial was held on April 26 and May 12, 2005. As explained

below, I now make certain findings of fact and conclusions of law as a result of which I award

judgment in favor of the plaintiff in the amount of $10, 232.90.

I.      Findings Of Fact

      A.      Tufano's Employment With RTI

Tufano was employed by RTI as a general freight truck driver for approximately eight

years ending on June 28, 2002. Transcript of Trial ("Tr.") 32, 34. At the time of his termination

Tufano earned approximately fifty thousand dollars per year and had health insurance coverage

provided by GHI, RTI's health insurance provider. Tr. 14, 35. Tufano claims that upon his

separation from Reigel, he was not made aware of his rights under COBRA by mail or otherwise. Tr. 34. However, he did claim to receive his W-2 and 401(k) information sometime in July of 2003 after he no longer worked for RTI. Tr. 46-47.

B.    Tufano's Surgery And Insurance Coverage

On December 6, 2002, Tufano was diagnosed with a gall bladder condition that required surgery. Tr. 37. Believing he was still covered, Tufano requested an authorization from GHI for laparoscopic surgery. *Id.* By letter dated December 11, 2002, Tufano received the authorization he sought from GHI to pay for the surgery. Tr. 38-39; Plaintiff's Exhibit ("PX") 14. However, the letter stated that "[t]his authorization is NOT a guarantee of coverage. Robert Tufano must be eligible for coverage at the time the actual services are rendered." PX 14.

Tufano believed at the time of his surgery that he was still covered under GHI. Tr. 39. GHI initially made payments on the medical bills associated with the surgery, but soon ceased such payments. Tr. 39-40. By letter dated January 1, 2003, GHI informed Tufano that his coverage had ended on October 1, 2002. PX 15. Tufano inquired of GHI and was told that his employment with RTI ended on June 28, 2002 and that his health insurance was subsequently cancelled on October 1, 2002. DE 38 at 5; Tr. 41. Dawn Salerno ("Salerno"), RTI's office manager, testified that it took three or four notifications before the insurance company terminated Tufano's coverage. Tr. 93.

In January 2003, GHI offered COBRA coverage to Tufano, who elected not to enroll due to ongoing litigation concerning his termination with RTI. Tr. 42; PX 33. Tufano planned to enroll for insurance coverage under his fiancé's policy once they were married. Tr. 43; PX 33-A.

Had Tunfano instead elected to enroll in COBRA through GHI in January of 2003, his coverage would have been retroactive to the termination date of his prior coverage. PX 33-A.

      C.      <u>The Administration Of RTI's Health Insurance Policy</u>

It was RTI's policy to provide health insurance for employees whose tenure surpassed 90 days. Tr.14. Robert Riegel ("Riegel"), as president of the company, was responsible for deciding which insurance RTI offered its employees and has changed insurance companies several times since 1999. Tr. 15, 24. RTI has offered GHI to its employees since 2002. Tr. 15.

The method by which employees received information regarding their health insurance varied. Sometimes there were meetings, sometimes information was placed in employee mailboxes or distributed with payroll, sometimes an insurance broker spoke to the employees, and sometimes the insurance companies mailed information directly to the employees. Tr. 15-16. Neither Riegel nor Salerno was able to specifically identify what documents were distributed or the means by which they were given to employees. Tr. 16, 105-06.

Salerno was responsible for payroll, human resources, customer service, and for mailing COBRA notices when appropriate. Tr. 80-81. Though RTI had no official "plan administrator," Riegel testified that Salerno was the contact person for employees who had any problems. Tr. 18, 21, 102. Salerno testified that she received some informal training from insurance brokers regarding COBRA procedures but was uncertain as to whether she or Riegel was the plan administrator. Tr. 102-03.

RTI maintained no written policy regarding advising health insurance participants of their rights under COBRA. Tr. 20. Neither did RTI maintain written office procedures describing the method for handling office documents. Instead RTI relied on oral policies derived from informal

conversations between Riegel and Salerno. Riegel testified that this was simply "our way of doing things. It was known." Tr. 21.

RTI's COBRA procedures were based on information provided by the insurance broker, Tacketts Insurance. Tr. 93-94. Kathy Tacketts, of Tacketts Insurance provided Salerno with an outline of the COBRA notification and instructed Salerno to mail the information within two weeks. *Id.* However, Riegel stated that it was RTI's policy to notify employees within 30 days of termination. Tr. 21. Neither Salerno nor Riegel knew if the initial COBRA notice was given to employees at the time of their enrollment in the health plan, or what information was required to be given to employees regarding their health plan and COBRA rights. Tr. 104; Tr.31. Moreover, in response to a discovery interrogatory asking whether any employees since January 2000 received COBRA benefits, RTI responded by stating "NA," apparently indicating the answer was none, or that they didn't know. In contrast, at trial Salerno testified that five or six employees elected COBRA benefits since 2000. Tr. 101.

Salerno testified that her procedure for mailing out COBRA notification letters involves opening a form letter in her computer and inserting the employee's name, address, and applicable premium charge. She would then print two copies, one on company letterhead to be mailed to the employee and the other on plain paper for the file. Tr. 81-83. The copy printed on letterhead would be signed, placed in an envelope, and run through a postage meter. *Id.* The envelope would then be placed on her desk until she put it in a U.S. mailbox located outside of the building. *Id.* This process would usually occur before noon each day. *Id.* The file copy would then be placed in a file marked "COBRA" located in a locked filing cabinet in the hallway. *Id.* Salerno testified that she followed this procedure approximately five or six times since 1999. Tr. 91.

D.	The Notice Allegedly Sent To Tufano

RTI retained the "file copy" version of the COBRA notification letter allegedly sent to Tufano to inform him of his rights. PX 34. This copy of the COBRA notice contains typographical errors, is not signed, and has no indication of having been mailed. *Id.* Salerno testified that she did not specifically remember mailing or typing plaintiff's COBRA notice, nor did she recall what class of postage was affixed to the envelope. Tr. 95-96. She simply states that she placed the letter in a regular envelope and ran it through the postage meter. *Id.* Salerno also testified that she recognized the file copy of Tufano's COBRA letter as something she had faxed to defendant's attorneys during discovery. Tr. 89-90. She stated that it looks like the COBRA notices she sends out but she was unable to identify it as a letter she allegedly sent to Tufano. Tr. 89-90.

In support of Tufano's claim that he was never mailed a letter informing him of his rights under COBRA from RTI, Tufano introduced testimony from former RTI employee Ike Wilson ("Wilson"). *See* Ct. Ex. 1 (deposition testimony). Wilson testified that he was employed by RTI for four years and that upon his resignation, he never received a COBRA notice from RTI. *Id.* at 11, 16-17. Wilson changed his address approximately two months before his resignation from RTI and despite informing the post office, never informed the company of the new address. *Id.* at 14. Sometime after his resignation, Wilson spoke with Salerno regarding money he was owed from his 401(k), but not about his rights under COBRA. *Id.* At 12-13.

II.     Conclusions of Law

     A.     Applicable Law

COBRA "requires that a group health plan provide for continuation of coverage of

medical benefits for inter alia, laid-off employees." *Local 217, Hotel & Restaurant Employees*

*Union v. MHM, Inc.*, 976 F.2d 805, 809 (2d Cir. 1992) (citing  29 U.S.C. § 1161(a)).  In the

event of an employee's termination, other than by reason of gross misconduct, *see* 29 U.S.C.

§ 1163(2), "the employer of an employee under a plan must notify the administrator of a

qualifying event [such as termination] within 30 days ... of the date of the qualifying event."  29

U.S.C. § 1166(2).  The plan administrator is "the person specifically so designated by the terms of

the instrument under which the plan is operated; if an administrator is not so designated, the plan

sponsor" – *i.e.*,  "the employer in the case of an employee benefit plan established or maintained

by a single employer" – assumes this role.  29 U.S.C. § 1002(16)(A)(i), (A)(ii), (B).

Once notified, the administrator is then obligated to notify, "any qualified beneficiary with

respect to such event, of such beneficiary's rights under this subsection."  29 U.S.C.

§ 1166(a)(4)(B).  "The qualified beneficiary may elect continuation coverage within sixty days of

the qualifying event or of notice of the qualifying event, whichever is later."  *MHM, Inc.*, 976 F.2d

at 809 (citing 29 U.S.C. § 1165(1)).

COBRA contains no specific requirements as to the manner in which notice must be given.

A "good faith" effort to notify the plan beneficiary is sufficient.  *See Ehrlich v. Howe*, 848 F.Supp.

482, 489 (S.D.N.Y. 1994); *Phillips v. Saratoga Harness Racing, Inc.*, 233 F.Supp. 2d 361

(N.D.N.Y. 2002).  In general, "[a]n employer or plan administrator who sends proper notice to

the covered employee's last known address is deemed to be in good faith compliance with

COBRA's notification requirements." *Hubicki v. Amtrak National Passenger Railroad Company*, 808 F.Supp. 192, 196 (E.D.N.Y. 1992) (citing *Truesdale v. Pacific Holding Co./Hay Adams Div.*, 778 F.Supp. 77, 81 (D.D.C. 1991)).

"There is a presumption that a letter properly addressed and mailed is received." *Desimone v. Siena College*, No. 90-CV-1058, 1991 WL 64857, at *2 ( N.D.N.Y. April 25, 1991) (citing 57 N.Y.Jur.2d, *Evidence and Witnesses* § 158, at 365-66 (1986)). However, for the presumption to arise, office practice must be geared so as to ensure the likelihood that a notice of cancellation is always properly addressed and mailed. *Nassau Ins. Co. v. Murray,* 46 N.Y.2d 828, 830 (1978). The presumption of mailing can be created "either by offering the testimony of the person who actually mailed the letter or through indirect evidence, that is, by offering proof that mail is sent pursuant to office procedures, followed in the regular course of business." *Desimone*, 1991 WL 64857, at *2. "Denial of receipt by the insured, standing alone, is insufficient to rebut the presumption." *Id*. The addressee has the burden of presenting evidence to establish non-receipt. *See Engel v. Lichterman*, 95 A.D.2d 536, 539 (N.Y. App. Div. 1983). To meet that burden plaintiff must show "some proof that the regular office practice was not followed or was carelessly executed so that the presumption that notice was mailed becomes unreasonable." *Desimone,* 1991 WL 64857, at *2 (citations omitted).

B.      RTI Did Not Provide Notification To Tufano As Required Under COBRA

The facts indicate that no specific employee of RTI was given the responsibility to administer RTI's health plan, and that Riegel and Salerno did not have a clear, common understanding of their respective responsibilities for ensuring that employees were aware of their rights under COBRA. *See* Tr. 18, 21. In the absence of such a delegation, RTI, as Tufano's

employer, is deemed both the "sponsor" and "administrator" of the GHI health insurance policy.

As such, RTI had the exclusive duty of providing Tufano with notice of his rights under COBRA

within 14 days of the end of his employment pursuant to 29 U.S.C. § 1166(c). *See also* 29

U.S.C. § 1002(16)(A)(i) and (ii).

RTI did not meet its legal obligation and provide Tufano with the required notice. The

evidence put forth by RTI fails to establish the presumption that Tufano received the notice letter

allegedly mailed. They could have established this presumption by either the testimony of the

person who "actually mailed" the letter or by evidence that the "mail is sent pursuant to office

procedures." *See Desimone*, 1991 WL 64857, at *2. RTI clearly does not meet the former

standard, as Salerno, the person who allegedly "actually mailed" the notice letter, testified that she

could not remember whether she ever deposited the letter in the mailbox. *See* Tr. 95.

RTI also does not offer sufficient proof that the letter was sent out pursuant to RTI's

internal office procedures. The evidence established that RTI did not maintain any written office

procedures for mailing notification to employee's regarding their rights under COBRA, nor any

other written procedures regarding advising employee's about their health insurance. *See* Tr. 21.

Indeed, RTI could not even keep track of the employees who elected to use COBRA coverage:

conflicting evidence was submitted regarding how many previous employees had been given

proper notice, or even elected to continue coverage under COBRA. *See* Tr. 16, 105-06; *see also*

Tr. 101. Salerno testified that, apparently pursuant to office policies known only to Salerno and

Riegel, that the process for sending COBRA notification entailed Salerno opening a form letter on

her computer and inserting into it the employee's name and address, printing two copies, signing

one of them, placing the signed copy in an envelope, mailing it, and placing the other in a file. *See*

8

Tr. 82-83. As proof that this procedure was followed, RTI offered the unsigned file copy of Tufano's notification letter. *See* PX 34. That copy contains neither any indication of having been mailed nor anything else to support the proposition that Salerno properly followed the procedure she described. That fact, coupled with Salerno's failure to remember any of the details associated with mailing the letter precludes me from finding that RTI established a presumption that Tufano received notice of his rights under COBRA.

Nevertheless, it remains Tufano's burden to prove the negative. Specifically, he must prove by a preponderance of the evidence that he did *not* receive the COBRA notice. I find that he has done so. First, Tufano's actions in seeking GHI approval for his surgery corroborate his denial that he received such notification. Second, the testimony of RTI's former employee Ike Wilson suggests that RTI's system for providing notice, such as it is, is prone to error. Like Tufano, Wilson testified that he did not receive notice of his rights under COBRA upon his resignation from RTI – but that RTI did manage to contact him at the new address he provided at the time of his separation regarding money he was owed from his 401(k) account. *See* Tr. 11, 16-17. Wilson's testimony thus tends to make more plausible Tufano's claim that, notwithstanding RTI's assertion of a sufficiently effective "informal" notification system, he did not receive the notice to which he was entitled. Tufano has therefore sufficiently demonstrated that, even if RTI did follow its own internal procedure, that procedure was so "carelessly executed" that it would be unreasonable to presume Tufano's notice was in fact mailed. *Desimone*, 1991 WL 64857, at *2.

C.  Damages

At the start of the bench trial, the parties stipulated that Tufano's damages were $10,232.90.  Tr. 4-5.  RTI nevertheless argues that Tufano is precluded from recovery because, by declining GHI's offer of retroactive coverage in January 2003, he failed to mitigate his damages.  *See* Tr. 55.  As explained below, I disagree.

The parties stipulated that "the total amount of medical bills would be $10,232.90, and *if liability is established*, then the defendants agree to assume responsibility for that amount ...."  Tr. 4-5 (emphasis added).  Thus, to the extent RTI seeks any comfort from Tufano's alleged failure to mitigate damages, it may only succeed if that failure defeats the finding of liability that would otherwise arise from its own failure to provide Tufano with the required COBRA notification.  Viewed in that light, RTI's mitigation theory must fail, because – as a defense to liability – failure to mitigate is an affirmative defense that the defendant must plead pursuant to Rule 8(c) of the Federal Rules of Civil Procedure.  "The general rule in federal courts is that a failure to plead an affirmative defense results in a waiver."  *Travellers Intern., A.G. v. Trans World Airlines, Inc.*, 41 F.3d 1570, 1580 (applying that rule in the context of the affirmative defense of failure to mitigate) (citing *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 642 n.2 (2d Cir. 1988); 5 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1278 (2d ed.1990)); *Eassa v. Hartford Fire Ins. Co.*, 1991 WL 255111, at *7 (N.D.N.Y. Nov. 29, 1991).  RTI did not plead failure to mitigate as an affirmative defense in its answer to Tufano's complaint, *see* DE 4, and has thereby waived its right to do so now.  I therefore hold the parties to their agreement on the record and, in light of the preceding finding of liability, decide that Tufano is entitled to damages in the stipulated amount of $10,232.90.

III.    Conclusion

For the reasons set forth above, I find in favor of the plaintiff and find the defendant liable

in the amount of $10, 232.90.  The Clerk is directed to enter judgment accordingly and thereafter

to close this case.

**SO ORDERED.**

Dated: Central Islip, New York
       February 11, 2006

                                    /s/ James Orenstein
                                    JAMES ORENSTEIN
                                    U.S. Magistrate Judge